SIMON, Justice.
This is a petitory action brought originally by The Brown Paper Mill Company, Inc. against Evans Calvert, asserting title to approximately 111.7 acres of land, situated in Section 37, Township 9 North, Range 8 West, in Natchitoches Parish, described more fully in plaintiffs’ petition as follows:
“A certain tract of land in Natchito-ches Parish, Louisiana containing 111.7 acres more or less, being Lot 4 of Section 37 in Township 9 North, Range 8 West, Louisiana Meridian, said Lot 4 being more particularly described as follows:
“Begin at a point on the western boundary line of Section 37, Township 9 North, Range 8 West, which is 54.90 chains from the northwest corner of said section, thence South 78 degrees East 37.10 chains, thence South 8 degrees West 29 chains to point ‘A’ on a public road formerly known as the Texas Road or Sabine Road, thence in a westernly direction following the meanderings of said road to point ‘A’, thence North 2514 degrees West 3.46 chains to the western boundary of Section 37, thence in a northeasternly direction along said boundary line 36 chains to the place of beginning. The whole being shown on plat of survey by Harry Percy dated August, 1894.”
Plaintiffs alleged that the defendant was in actual possession of a portion of the afore-described Lot 4, comprising approximately 70 acres, without right, title or interest therein, fully narrating its own chain of title as the basis of its asserted ownership.
For answer the defendant denied plaintiffs’ title and ownership to a portion of Lot 4, hereinafter described, asserted its ownership thereof, and delineated his own chain of title in proof of his alleged ownership. In the alternative, he pleaded ownership of said portion by virtue of the prescription of ten years acquirendi causa.
After a hearing held below on the merits and prior to rendition of judgment, plaintiffs sold the entirety of Lot 4, with other property, to the Olin Mqthieson Chemical Corporation, which in turn sold to the International Paper Company all of the merchantable timber thereon and concurrently executed a long-term lease for conducting its timber operations. These two parties have been properly substituted as parties- ’ plaintiff.
There was judgment in favor of plaintiffs recognizing them as the true and lawful owners of Lot 4, described above, and rejecting defendant’s plea of acquisitive prescription from which the defendant presents this appeal.
Section 37 within which the disputed area is embraced is shown to be an old grant and is commonly referred to as the “Murphy Claim.” It is diamond shaped and contains 847.50 acres, as shown on the original government plat of record. It also appears that the entire Section 37 was originally owned by Walter J. Burke, he being the common author of the asserted title of the litigants.
It appears that in 1894 Burke engaged the services of Peter J. Gibson, a licensed surveyor of Natchitoches Parish, to partition the entire Section 37 into six separate lots of varying and irregular dimensions. A map showing the area dimensions and representative calls of each of the six lots ■ was made by one Harry Percy, surveyor, in accordance with the field notes of the Gibson survey; and in the sale of these lots Burke specifically made reference to said map, each lot being sold pursuant to the calls for courses and distances shown thereon.
*589 We are informed that, despite the fact that in the deeds of transfer made by Burke of the respective six lots and in which the Percy map was referred to as being “recorded therewith,” it cannot be found and its whereabouts are unknown. H'owever, using the exact calls for courses and distances specifically set out in the deeds conveying the six lots, the Percy map was reconstructed by George W. Foster, a surveyor, and by M. H. Carver of the Natchi-toches Abstract Company, and which unquestionably reflects a graphic and precise portrayal thereof. From these two reconstructed maps we attach a composite duplicate sketch and make it a part of this opinion for a more lucid disposition of the issues.

*590 In 1894 Lot 4 was sold by Burke to Philip J. Poche, the Percy map being referred to as recorded therewith, and is described as follows:
“A certain tract of land being a part of the Murphy claim (Section 37) in Township 9, Ranges 7 and 8 West, said tract so sold herein beginning in the Western boundary line of said Murphy claim (Section 37) at a point 50.90 chains from the Northwest corner thereof; running thence in an Easterly direction along a line parallel with the Northern boundary line a distance of 37.10chains to Garner’s line; thence South 8 degrees West 29 chains to ‘A’ the Southwest corner of Garner’s land; thence in a Westerly direction along the public road following its meanderings to 'B' in the public road near the Western boundary line; thence in a Northwesterly direction to the boundary line a distance of 3.46 chains; thence in a Northeasterly direction along the said Western boundary line a distance of 36 chains to the place of beginning, as shown by a map made by Harry Percy recorded herewith.”
It appears that Lot 4, besides three other lots, was reacquired by Burke in the year 1898; and on August 19, 1898, Burke conveyed Lot 4, with other property, to D. C. Scarborough and M. H. Carver. The Brown Paper Mill Company, Inc., on July 2, 1943, purchased by deed all of Lot 4, besides other property, from Scarborough and the heirs of M. H. Carver.[1]
Defendant’s chain of title finds its origin in the deed of Lot 6, dated September 11, 1894, by Burke to John G. Berry, James L. Berry, and W. A. Berry, containing approximately 235.89 acres. Following mesne conveyances Lot 6 was subsequently acquired by James W. Jones, Jr., defendant’s attorney of record. After various transfers of this lot by and between Jones and his miscellaneous corporations it was ultimately acquired by Evans Calvert, the defendant herein, from the St. Denis Securities Company, Inc., by deed dated May 10, 1954. The original deed above referred to described Lot 6 as follows:
“A certain tract containing 235.89 acres beginning at the Southwest corner of said Murphy claim (Section 37), thence running north 39 degrees 30 minutes East 27.10 chains to Poche’s corner; thence South 2514 minutes East 3.46 chains to a public road; thence in an Easterly direction along the public road to the Southwest corner of Garner’s land, marked ‘A’ on a plat of survey made in August, 1894 by Harry Percy and recorded herewith ; thence South 78 degrees East 27 chains to the Eastern boundary line of said claim (Section 37); thence South 39 degrees 30 minutes West along the said Eastern boundary line to the Southeast corner of the claim 30.10 chains; thence North 78 degrees West along the Southern boundary line 81.10 chains to the place of beginning.”
It is obvious, when reference is made to the calls set out in the original deeds of these two lots, that the Southern boundary of Lot 4 is shown to be “along the public road to the Southwest corner * * (in an Easterly direction).” It also appears that in the deed of Lot 4, from Scarborough and Carver’s heirs to plaintiffs, this road is therein referred to as the “Old Texas Road.” On the other hand, in the various deeds between James W. Jones, Jr. and his miscellaneous corporations, we find the description of Lot 6 as being bounded on the North by the “Spanish Lake Road.” In the original deed of Lot 6 executed by *591 Burke, the road referred to therein is not designated by name.
Adverting to the attached sketch, it is plaintiffs’ contention that the road designated in its deed running in an Easterly direction, and which it asserts forms its Southern boundary, is shown thereon as beginning at letter “F” to “G” to “H”, “A” and “I”. On the other hand, it is defendant’s contention that the road referred to in his deed, branching off from the above-referred to road at point “H”, in a Northwesterly direction and which, it is asserted, forms his Northern boundary, is designated on said sketch as beginning at letter “H” to “D”. It therefore appears that from these opposing contentions the land in dispute, comprising 70.25 acres, is designated on said sketch as the shaded area which is embraced within letters “D”, “E”, “G”, “H” and back to letter “D”. Plaintiffs’ contention is that this shaded area belongs to and forms a part of Lot 4 as originally deeded with the “Old Texas Road” as its Southern boundary; and the defendant contends that this area is a part of Lot 6 with its Northern boundary running from point “H” to point “D” on said sketch.
By reference to the government plat approved by R. W. Boyd,.Surveyor General of Louisiana, January 3, 1851, and as reflected by the field notes made in connection with the governmental survey of Township 9 North, Range 8 West, there appears thereon a dotted line identified and marked “Sabine Road.” This road is shown on the governmental plat as entering the Western boundary of Section 37. at point “F”, running in a Northeasterly, direction across the lower center of Section 37 with its exit at point “I” of said attached sketch. It is significant that the field notes made in connection with the governmental survey refer to this road as the “Old Texas Road.” It would not be inappropriate to say that the names or connotations of “Sabine Road” and “Old Texas Road” are synonymous since it is shown that this road leads from Texas to Louisiana, traversing the Sabine River and the area known as “Sabine Country.” Furthermore, it appears that this road has been referred to by others as the “Spanish Lake Road,” and the “Lone Star Road,” which we would think are synonymous and denominate one particular road, namely the “Sabine” or “Old Texas Road.”
The calls for courses and distances as designated in the original deeds of Lot 4 and Lot 6 are manifestly controlling. When these calls are scrutinized and contrasted with the attached sketch, we find the deed of Lot 4 calling for a point beginning at 50.90 chains from the Northwest corner of Section 37, and which is shown as letter “C”; thence in an Easterly direction along a line parallel with the Northern boundary line a distance of 37.10 chains to Garner’s line, which on said plat is the line from “C” to “B”; thence South 8 degrees West 29 chains to “A”, the Southwest corner of Garner’s land, and is designated'as “B” to “A”, Garner owning the adjoining Lot 5; thence in a Westerly direction along the public road near the Western boundary line of Section 37, which is from “A” to “G”; thence in a Northwesterly direction to the boundary line of Section 37, a distance of 3.46 chains, which is shown from “G” to “E”; thence in a Northeasterly direction along the Western boundary line of Section 37, a distance of 36 chains to the place of beginning, which is shown as point “E” to “C”.
The calls for courses and distances in the original deed of Lot 6, when examined and compared with the attached sketch, show a description of a tract of land containing 235.89 acres beginning at the Southwest corner of said Murphy claim (Section 37), which is marked “F”; thence running North 39 degrees 30 minutes East 27.10 chains to Poche’s corner (Lot 4), which is designated as letter “E”; thence South 25J4 minutes East '3.46 chains to a public road, which is designated as letter “G”; thence in an Easterly direction along the public *592 road to the Southwest córner of Garner’s land, marked “A” on the plat of survey made by Harry Percy, and which hears the similar lettering “A”; thence South 78 degrees, East 27 chains to the Eastern boundary line of Section 37, which is designated as letter “I”, thence South 39 degrees 30 minutes West along the said Eastern boundary line to the Southeastern corner of Section 37, 30.10 chains, which is designated as letter “J”; thence North 78 degrees West along the Southern boundary line 81.10 chains to the place of beginning at letter “F”.
It appears from the testimony of Johnny Berry, a son of one of the original purchasers (John G. Berry), and that of James L. Berry (over 80 years of age), also one of the original purchasers of Lot 6, that they occupied and lived on the land acquired by the Berrys, and that said land was South- of the road, this road being then recognized as the Northern boundary line of Lot 6. They further testified that they at no time owned any property North of any road or located between any roads, and that there was no road leading through their land. It is manifest, therefore, if the defendant’s contention is accepted, that the “Old Texas Road” or “Sabine Road” would have traversed through Lot 6. They further testified that the land purchased by the Berrys comprised approximately 235 acres, that it was located on the South side of the road, known ás the “Natchitoches-Texas Road,” and that neither member of the Berry family made any claim for land lying North of the “Old Texas Road” or any road at all, all of their property being South thereof. Mr. J. N. Lofton, who had purchased a portion of the Berry property in the Southwestern part of Section 37, likewise corroborated the foregoing testimony as to the “Old Texas Road” being the Northern boundary of Lot 6. It is significant that in his testimony he referred to a road which branched off the “Old Texas Rpad,” which-on said plat is designated as running from letter, “H” to letter “D”, but ■ that said branch road was at no time considered as the Northern boundary of Lot 6.
From the original deed of Lot 4 the calls for courses and distances therein comprise a total acreage of 111.7 acres. Were we to accept an old road marked “D” to “H” on said sketch and recognize defendant as the owner of the shaded area lying between points “D”, “E”, “G”, and “H” containing 70.25 acres, it would leave Lot 4 containing a-total acreage of 41.45 acres. On the other hand, Lot 6, according to its original calls, contains 235.89 acres. Were we to recognize the defendant as the owner of the shaded area as aforestated, it would result in Lot 6 containing 306.14 acres. The acreage, either by decreasing Lot 4 and increasing the acreage of Lot 6, would be clearly at variance and in conflict with the calls for courses and distances set forth in the original deeds of said two lots and as shown on the attached sketch.
We are convinced, therefore, that Lot 6 lies South of the “Old Texas Road” as designated on the attached sketch, and that the plaintiffs are the true record owners of Lot 4 in accordance with the description contained in the original deed, and designated on said attached plat as lying within the letters “A”, “B”, “C”, “E”, “G”, and back to “A”.
Having concluded that plaintiffs have-proven a record title to the disputed land, we now consider defendant’s plea of ten. years acquisitive prescription. A title so-asserted is necessarily predicated on Article 3478 of the LSA-C.C. which provides-that: “He who acquires an immovable in. good faith and by just title prescribes for it in ten years * *• To acquire the ownership of an immovable by the species of this prescription four essential conditions must concur, the absence of any one of which would be fatal to the claim. Article 3479 of the LSA-C.C. provides these concurring conditions to be:
*593 "1. Good faith on the part of the possessor.
“2. A title which shall he legal, and sufficient to transfer the property.
“3. Possession during the time required by law, which possession must be accompanied by the incidents hereafter required.
“4. And finally an object which may be acquired by prescription.”
Article 3487 of the LSA-C.C. provides in part as follows:
“1. That the possessor shall have held the thing in fact and in right, as owner; when, however, it is only necessary to complete a possession already begun, the civil possession shall suffice, provided it has been preceded by the corporal possession.
“2. That the possession shall have been continuous and uninterrupted, peaceable, public and unequivocal; * He * ”
In support of his plea of prescription defendant contends that in January, 1932, James W. Jones, Jr., acting for the Rio Hondo Land Co., Inc., one of Jones’ corporations, constructed a fence in the year 1931 or 1932 along the road shown on the sketch, running from letter “D” to.letter “H”, to serve as an enclosure for the pasturing of cattle and which continued to be used as such until January, 1942. Jones was the sole witness who testified that such a fence was so constructed. Though another witness testified regarding the existence of a fence, little weight can be attached thereto, his testimony being completely vague and most inconclusive.
On the other hand, the testimony of many witnesses was presented by plaintiffs to the effect that the lands in that area had always been considered and publicly used as an “open range” uninhibited by barriers or enclosures, and that they had minutely checked the road referred to by defendant along which he has asserted a fence was constructed in 1931, but that they were unable to find any signs or remnants whatever of a pre-existing fence. George W. Foster, Jr., who made a survey of the property in question, testified that he and his surveying crew had diligently searched for any sign of an old fence and were unable to find any remnants thereof other than a fence built in 1952. There is uncontradict-ed testimony by plaintiffs’ witnesses to the effect that plaintiffs and their predecessors in title, Scarborough and Carver, had often cut and removed timber on the disputed property without any opposition or protest from anyone, this to the knowledge of the residents in that area. As aforestated, it was commonly recognized that the territory in which the disputed property is located was considered open range, thus allowing cattle to graze and roam at large. Manifestly, the fencing in of any portion of open range lands would be so much the exception that it could not have escaped the attention or observation of landowners in that area. It is significant that the defendant was unable to produce any disinterested person to bear witness to the existence of such a fence as contended by him.
We must necessarily conclude that the defendant has not borne the burden of proof that he and his predecessors in title were in continuous and uninterrupted, peaceable, public and unequivocal possession for the prescribed period of ten years. Failing in this respect, his plea must necessarily fall.
Accordingly, for these reasons, the judgment appealed from is affirmed.
McCALEB, J., recused.
PONDER, J., absent.

. Carver having died and Ms heirs duly recognized and placed in possession of the decedent’s estate by judgment of court, dated September 6, 1928, NateMtoches Parish.